[909 NYS2d 421]

In the Matter of NORMAN LEONARD COUSINS, an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, October 19, 2010

### APPEARANCES OF COUNSEL

*Alan W. Friedberg, Chief Counsel, Departmental Disciplinary Committee*, New York City (*Mady J. Edelstein* of counsel), for petitioner.

*Victor M. Serby*, for respondent.

### OPINION OF THE COURT

Per Curiam.

Respondent Norman Leonard Cousins was admitted to the practice of law in the State of New York by the First Judicial Department on December 22, 1969. At all times relevant to this proceeding, respondent has maintained an office for the practice of law within this Department.

This disciplinary proceeding arises out of respondent's representation of Kevin Veneski and his wife in a medical malpractice action, *Veneski v Queens-Long Is. Med. Group*. In June 1997, the Veneskis retained respondent pursuant to a written retainer agreement which set forth the sliding fee scale mandated by Judiciary Law § 474-a. They also signed a litigation financing agreement under which they would borrow money from respondent for expenses and disbursements at an interest rate of 15% per year. To fund the *Veneski* action and other cases, respondent apparently borrowed several hundred thousand dollars from various litigation funding companies, including Core Funding Group, LLC (Core Funding) and Legal Asset Funding, LLC (LAF), pledging some of the same collateral to both entities.

After a jury awarded the Veneskis $4,215,300 in damages, Mr. Veneski signed an affidavit on February 26, 2000 in support of a potential application by respondent for increased compensation pursuant to Judiciary Law § 474-a, stating: "I intend to give [respondent] one third (1/3) of the net recovery he has obtained for me in this action whether it be denominated a fee, gift or gratuity (a tip)." Respondent did not file the affidavit or seek court approval for an increased fee until 2006.

After this Court ordered a new trial (285 AD2d 369 [2001]), the malpractice action was settled in November 2002 for $3 million plus an annuity that would yield $750,000 over 20 years. On December 12, 2002, respondent wrote to Mr. Veneski that he was about to receive the first payment of $1 million, and that "[s]ubject to court approval (if required), the attorney fee is one-third of the net recovery." Respondent calculated that he was owed $154,011.26 in disbursements and $281,996.25 in attorney's fees from that payment. At some point the Veneskis paid respondent an additional $63,000 as interest on disbursements.

Thereafter, the malpractice defendants' main insurance carrier became insolvent and the remaining $2 million of the settle-

ment was to be paid by the Liquidation Bureau. Respondent represented to the liquidation court that his attorney's fee on that payment was $212,500. In contrast, he wrote to Mr. Veneski in October 2003 that he was "owe[d]" $454,450.55, representing $666,524.73 in "attorney's fees" plus $425.82 in disbursements, less the $212,500 set aside for him by the Liquidation Bureau. After receiving the payment, Mr. Veneski gave respondent a check for $454,450.55 and, upon respondent's request, crossed out the words "attorneys fees" he had written on the memo line, and substituted "gift." At the same meeting, Mr. Veneski signed a gift tax return in blank, which respondent sent to respondent's accountant to fill in. When respondent received the first annuity payment of $20,000 in October 2005, he wrote to Mr. Veneski that he was applying it to disbursements and interest.

Meanwhile, in July 2003, after learning that respondent had purportedly executed and delivered to the Superintendent of Insurance an assignment directing that his $666,666 fee in the *Veneski* action be paid to two litigation funding companies controlled by LAF's principal, Thomas DeClemente, Core Funding commenced an action in the United States District Court against respondent, LAF, DeClemente, and others to protect its priority interest in the collateral (*see Core Funding Group, LLC v Cousins et al.*, US Dist Ct, SD NY, 03 Civ 5575). LAF crossclaimed and filed a third-party complaint against respondent and Mr. Veneski alleging, among other things, that when Mr. Veneski signed the February 26, 2000 affidavit supporting a potential application for increased attorney's fees, it was done to fraudulently induce LAF to advance funds to respondent.

On September 12, 2003, the liquidation court ordered that the $212,500 fee claimed by respondent be paid into the registry of the United States District Court as part of the resolution of the Core Funding action, which was settled in December 2003 with Core Funding having received that payment.

The Veneskis were also sued by LAF in New Jersey (*Legal Asset Funding, LLC v Cousins*, 2005 WL 2099281 [D NJ 2005]; *Legal Asset Funding, LLC v Cousins*, NJ Super Ct, Ch Div, docket No. HUD-C-1-04]) and in Pennsylvania (*Legal Asset Funding, LLC v Veneski*, 2006 WL 2623884, 2006 US Dist LEXIS 64939 [MD Pa 2006]) in connection with the funds borrowed by respondent. Respondent was admitted pro hac vice to represent the Veneskis in the Pennsylvania action, although almost all the work appears to have been performed by local,

lead counsel. Apparently, both the New Jersey and Pennsylvania actions were resolved upon respondent's payment of $340,000 to DeClemente.

On February 1, 2006, respondent filed a motion in the *Veneski* action for an increased fee. The Veneskis cross-moved for an order finding that respondent owed them $1,231,061.89. By order dated January 30, 2007, Justice Heitler determined that respondent had billed and received one third of the $3,000,000 lump sum without court approval. She referred the issue of disbursements to a referee. Respondent filed a notice of appeal, but the appeal was dismissed for failure to prosecute.

By order entered December 14, 2007, Justice Heitler denied respondent's motion for reargument and renewal based, among other things, on his claim that the $454,450.55 check he received from the second installment was a gift, not a fee, which he accepted because it "was the only way at the time I could protect [Mr. Veneski] from . . . DeClemente." Justice Heitler found that respondent failed to offer a reasonable explanation as to why he did not offer his new evidence earlier and that in any event, under Code of Professional Responsibility Canon 5, such a substantial gift from a brain-damaged client would have required a writing, reviewed by independent counsel, which was not done.*

Meanwhile, a Referee determined, after a hearing, that respondent had overcharged $11,000 in disbursements. By order dated May 21, 2008, Justice Heitler confirmed the Referee's report in part, but found an overcharge of $56,924.06 in disbursements. Respondent was directed to return that overcharge and excessive attorney's fees of $508,229.70, with interest, and judgment was entered against him and on January 7, 2009, in the amount of $619,538.25. By order entered April 6, 2010, this Court dismissed respondent's appeal from the judgment.

By order entered June 5, 2009, this Court, giving collateral estoppel effect to Justice Heitler's findings that respondent demanded and charged his client $508,229.70 in fees above the amount permitted by Judiciary Law § 474-a, and overcharged

---

* The new evidence included a letter from respondent to his accountant enclosing an Internal Revenue Service gift tax form allegedly signed by Mr. Veneski on November 8, 2003, and a letter to Mark S. Adler, Esq., signed by Mr. Veneski in 2005, stating: "I Kevin Veneski gave Norman Cousins a gift for the work he did for my case and do not want it back. I just want to be compensated if I am sued by DeClemente and have to pay him."

$56,924.06 for expenses and disbursements, granted the Departmental Disciplinary Committee's petition and found respondent guilty of professional misconduct in violation of Code of Professional Responsibility DR 1-102 (a) (4) (conduct involving fraud, dishonesty, deceit, or misrepresentation) and (7) (conduct adversely reflecting on respondent's fitness as a lawyer) and DR 2-106 (a) (charging or collecting illegal or excessive fees) (22 NYCRR 1200.3 [a] [4], [7]; 1200.11 [a]). Accordingly, we referred the matter to a Referee to be appointed by the Court to hold a hearing and issue a report and recommendation solely on the issue of the appropriate sanction.

At the hearing, the Committee called no witness and offered 20 exhibits into evidence, including a 1990 admonition of respondent, without formal proceeding, for dishonest conduct (DR 1-102 [a] [4] [22 NYCRR 1200.3 (a) (4)]) by falsely notarizing an affidavit. Respondent testified on his own behalf, called four character witnesses and introduced 14 exhibits into evidence.

Respondent maintained that he accepted a gift given by Mr. Veneski to extricate the Veneskis from the Core Funding lawsuit and that any claim of duress or undue influence was vitiated by Mr. Veneski reaffirming the gift multiple times over the ensuing years while represented by other counsel. Respondent credited himself with shutting down his practice to devote his time to defending the Veneskis in the LAF litigation, at no cost.

On November 24, 2009, the Referee submitted his report and recommended disbarment. The Referee found "incredible" respondent's testimony that Mr. Veneski intended to make a gift of $454,000, or that respondent believed in good faith that it was a gift. In addition to the fact that Justice Heitler had also rejected respondent's claim as "incredible," the Referee based his conclusion on several factors, including that at the time each installment of the settlement payment was due, respondent wrote to Mr. Veneski that he was "owed" one third of the amounts as "attorney's fees"; Mr. Veneski originally wrote "attorneys fees" on the memo line of the $454,000 check and only wrote "gift" at respondent's request; nothing in the relationship between Mr. Veneski and respondent would explain a gift of that amount; respondent did not "take any of the precautions one would expect a lawyer to take when accepting a 'gift' of this magnitude from a client in circumstances such as this"; and respondent's belated motion for increased legal fees was inconsistent with his claim that he had received such a substantial gift.

The Referee also identified several aggravating factors, including the vulnerability of Mr. Veneski, whom respondent himself had characterized as severely brain-damaged; respondent's lack of remorse, candor and insufficient appreciation of the seriousness of the proceedings; respondent's prior admonition for false notarization, which was made worse by his attempted minimization thereof; and respondent's failure to satisfy the judgment. Further, a loan respondent brokered between Mr. Veneski and another of his clients, and three other lending scenarios he proposed, constituted a pattern of improper business dealings, or at the least a lack of "appropriate sensitivity to his fiduciary responsibilities as an attorney."

The Referee noted respondent's four character witnesses, but thought their relevance was diminished because they were not aware of the precise circumstances of purported gift and Mr. Veneski's condition. As to respondent's portrayal of his participation in the funding litigation as pro bono, the Referee found the value of the services "questionable."

The Hearing Panel, after hearing argument and reviewing the record, adopted the Referee's report and recommended the sanction of disbarment.

The Committee now moves to confirm the reports of the Referee and the Hearing Panel and for an order of disbarment. Respondent opposes and requests an opportunity "to examine (or cross-examine)" Mr. Veneski. Respondent continues to insist that he was denied a hearing and due process by Justice Heitler with respect to the three orders finding misconduct, and by this Court's collateral estoppel order. He also submits affidavits, not presented to the Referee or Hearing Panel, from three clients, requesting that he be spared any sanctions that would interfere with his continued representation.

We agree with the Referee and Hearing Panel that disbarment is the appropriate sanction (*see Matter of Harley*, 298 AD2d 49 [2002]). Respondent charged a brain-damaged client over $500,000 more than the statutory maximum in attorney's fees. He tried to disguise those fees as a gift, and deceived his client to secure his assistance in the charade. Respondent has yet to satisfy the judgment directing him to return those fees and the over-billed disbursements, and he has a pending petition for chapter 7 bankruptcy relief. His other attempted and accomplished plans to obtain financing from clients demonstrate a pattern of conduct which, at best, reflects an indifference to his clients.

The Referee, who had an opportunity to observe respondent, found him to be deficient in honesty, remorse, and insight. Even at this stage of the proceeding, respondent attempts to relitigate the orders underlying the collateral estoppel finding, seeks to delay (by requesting an examination of Mr. Veneski), and tries to use clients with pending cases (the three affiants) to extricate himself from an adverse position and to the detriment of another client (the Veneskis).

No extreme mitigating circumstances are present warranting a departure from the penalty of disbarment (see Matter of Blumstein, 22 AD3d 163, 166 [2005]). Respondent's claim that the gift was requested by Mr. Veneski to resolve the Core Funding litigation is belied by the fact that respondent contradictorily stated that Mr. Veneski never even knew that he had been sued, and by the fact that the Core Funding litigation was brought three years after Mr. Veneski signed the affidavit granting respondent one third of his net recovery, "whether it be denominated a fee, gift or gratuity (a tip)." Moreover, during his deposition in LAF's New Jersey action, respondent testified that Mr. Veneski was "severely brain damaged" and suffered "extensive brain damage," and had signed an affidavit in support of a demand for a return of fees from respondent merely because counsel asked him to. Nor are respondent's efforts to shift the blame for his misconduct to LAF's principal, Mr. De-Clemente, persuasive.

Accordingly, the petition to confirm the Hearing Panel's determination, confirming the Referee's report and recommendation, should be granted and respondent disbarred from the practice of law in the State of New York.

Gonzalez, P.J., Mazzarelli, Andrias, Moskowitz and Renwick, JJ., concur.

Respondent disbarred, and his name stricken from the roll of attorneys and counselors-at-law in the State of New York, effective November 18, 2010.